## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANTHONY LUCIOTTI, *et al*,

        Plaintiffs,

   v.

THE BOROUGH OF HADDONFIELD,
NEW JERSEY,

        Defendant.

No. 1:20-cv-3539

**OPINION**

**APPEARANCES**:

Patrick Howard
SALTZ MONGELUZZI BARRETT & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103

    *On behalf of Plaintiffs*.

Robert J. Gillispie, Jr.
Francis X. Donnelly
TURNER, O'MARA, DONNELLY & PETRYCKI, PC
2201 Route 38
Suite 300
Cherry Hill, NJ 08002

    *On behalf of Defendant*.

**O'HEARN, District Judge.**

    This matter comes before the Court on a motion for summary judgment and to preclude the expert testimony of Plaintiffs', Anthony and Patricia Luciotti and William and Jessica Vespe (collectively "Plaintiffs"), expert witness by Defendant, the Borough of Haddonfield ("Defendant" or "the Borough"). (ECF No. 70). Plaintiffs thereafter cross-moved for summary judgment on

Count Five of the Amended Complaint, (ECF No. 72), and filed a separate motion to preclude Defendant's expert, (ECF No. 73). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, Defendant's Motion for Summary Judgment and to Preclude Plaintiffs' Expert is **DENIED**, Plaintiffs' Cross-Motion is **DENIED** and their Motion to Preclude Defendant's Expert is **DENIED.**

## BACKGROUND[1]

### A.  The June 2019 Rainstorm

On June 20, 2019, Plaintiffs' two individual family homes on Concord Drive in Haddonfield sustained significant property damage following a rainstorm. (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 1). Indeed, the rainfall during and preceding the June rainstorm was more than average rainfall. (Def. SOMF, Def. Br., ECF No. 70-1, ¶¶ 6–8). Both homes are situated on a topographical low point of a natural drainage basin. (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 2). An easement on land owned by Defendant, which abuts Port Authority Transit Corporation ("PATCO") tracks, runs between Plaintiffs' properties. (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 3). Haddonfield owns and maintains a stormwater drainage system on the easement, including two pipes that run underneath the PATCO train line. (Def. SOMF, Def. Br., ECF No. 70-1, ¶¶ 3, 13). Defendant modified the drainage system in 2014 ("2014 Modifications"). (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 4).

As a result of the June 20, 2019 storm, the Luciotti family alleges their home's foundation wall collapsed, their home flooded, and they lost all of their belongings, including their cars. (Pl. SOMF, Pl. Br., ECF No 72-2, ¶ 39). The Luciotti's home was ultimately deemed uninhabitable by the Borough. (Pl. SOMF, Pl. Br., ECF No. 72-2, ¶ 40). Though the Luciotti's home has been

---

[1]  The facts set forth herein are undisputed unless otherwise noted.

uninhabitable, they continue to pay the mortgage, taxes, and maintenance expenses of the home. (Pl. SOMF, Pl. Br., ECF No. 72-2, ¶ 39). The Vespe family alleges they lost most of their belongings on the first two floors of their home because of the flooding. (Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 41). They spent the remainder of 2019 in a pop-up camper on their front lawn, while their home was repaired. (Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 41).

Absent that a storm occurred on June 20, 2019, and that there is an easement on land owned by the Borough abutting Plaintiffs' properties, the parties agree on little else. Indeed, the parties disagree as to the intensity of the storm (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 1; Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 38), the designs underlying the 2014 Modifications and the analysis undertaken prior to approving the designs (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 4; Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 25), the amount of rainfall preceding the June 20, 2019 storm (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 6), the actual cause of the extensive property damage (Def. SOMF, Def. Br., ECF No. 70-1, ¶ 13), and the maintenance of the drainage system (Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 36), among other issues.

Based on the property damage following the rainstorm, Plaintiffs brought claims against Defendant asserting a violation of the Takings Clause of the Fifth Amendment under 42 U.S.C. §§ 1983, 1988 (Count One), inverse condemnation under 42 U.S.C. §§ 1983, 1988 (Count Two), nuisance (Count Three), negligence (Count Four), and trespass (Count Five). (Am. Compl., ECF No. 16, ¶¶ 53–83).

### B.  The Report and Deposition of Plaintiffs' Expert, Charles Dutill, II, P.E., D.F.E.

Plaintiffs retained a hydrology and hydraulic engineering expert, Charles Dutill, II, P.E., D.F.E., who authored two reports evaluating the "circumstances related to [Plaintiffs' case] involving stormwater runoff, hydrology, flooding, stormwater management, drainage, backups,

storm sewers, hydraulics, maintenance, construction, operations, design, inspections, modeling, regulations, notice, and [s]tandard of [c]are in Haddonfield Borough." (Dutill Rep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. B at 1; Dutill Rep., Pl. Br., ECF No. 72-4, Ex. M). On July 28, 2022, Dutill was deposed. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K).

Dutill, a professional engineer licensed in New Jersey, owns Heritage Technical Services, Inc. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 8:22–9-1, 12:23–13:21). The company provides hydrology and environmental engineering services to municipalities and municipal authorities, among other entities. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 9:3–10). Dutill has prior experience as an expert, having been deposed and testified for a total of forty-five days and thirty days, respectively. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 11:2–12:2). Dutill also has experience designing stormwater management systems. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 14:2–4).

After reviewing the relevant area's topography, Dutill determined that the key lowest point of topography was the entrance to the two pipes under the PATCO lines behind Plaintiffs' properties. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 15:8–18, 26:3–21). Dutill testified that the topography of the land between Concord Drive and the PATCO lines slopes downhill. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 32:24–33:5). Dutill also testified that stormwater would "tend to disperse and pond at the PATCO lines and then move toward Concord Drive as it fills up." (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-16, Ex. K at 33:15–19).

Regarding the cause of the flooding on Plaintiffs' properties, Dutill opined in his report:

It is my opinion, to a reasonable degree of engineering certainty, that the Borough of Haddonfield directed runoff to the two relevant properties and, in particular, the two houses on the two properties to the degree that the 2014 stormwater project utilized trash racks with grids that were too fine, such that they collected

4

significantly more debris than they should have; to the degree that there was a significant reduction in the capacity of the stormwater system after the 2014 modifications were implemented rather than prior to the stormwater modifications; to the degree that, in 2020, the Borough of Haddonfield recognized that they should divert 24 of the 30 acres that flow to the backs of these two relevant properties away from these two properties, but did not implement that plan well in advance of the June 2019 storm as they should have; to the degree that there were two trash rack/headwall collapses at the inlet to the PATCO pipes and the outlet from the PATCO pipes under the PATCO lines in association with the June 2019 storm due primarily to excessive debris at the locations of the two collapses; to the degree that the additional inlets and stormwater piping in Concord Drive in the 2017/2018 period resulted in significantly greater stormwater volume at the two relevant properties and in significantly greater peak stormwater flow rate behind the two relevant houses; and to the degree that there has not been proper maintenance of the stormwater systems at the PATCO lines, upstream from the PATCO lines, and downstream from the PATCO lines, resulting in substantial accumulations of debris with associated major obstructions of the stormwater management systems in these areas resulting in a major increase in flooding there.

(Dutill Rep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. B at 24–25).

### C. The Report and Deposition of Defendant's Expert, Clay H. Emerson of Princeton Hydro, LLC.

Defendant retained a hydrology and hydraulic engineering expert, Clay H. Emerson, Ph.D., of Princeton Hydro, LLC, who authored a report ("Emerson Report") providing his "professional opinion on the circumstances and specific causes of the damage which occurred during the storm" and to "render our professional opinion regarding the standard of care associated with the design of the recent modifications to the drainage structure." (Emerson Rep., Def. Br., Gillispie Cert., ECF No. 70-6 at 1–2). Emerson performed "a hydrologic and hydraulic model of the stormwater system in the Concord Drive area of the Borough of Haddonfield to determine the causes of the flooding experienced during the June 20, 2019 storm event." (Emerson Rep., Def. Br., Gillispie Cert., ECF No. 70-6 at 16). Emerson was deposed on July 26, 2022. (Emerson Dep., Pl. Br., ECF No. 72-10, Ex. S).

Emerson found that the ten-month period leading up to the June 2019 storm was "the single wettest corresponding 10-month period ever recorded in the region in over 150-years of record." (Emerson Rep., Def. Br., Gillispie Cert., ECF No. 70-6 at 6). Ultimately, Emerson determined that four factors contributed to the flooding: (1) the intensity of the storm "approaching a 200-year return period for the critical 30- and 60-minute durations," "which far exceed[ed] the design requirements for similar new construction structures," (2) the storm followed a "record-setting wet period," resulting in "a larger volume of runoff from the June 2019 storm," (3) in all simulations undertaken by Princeton Hydro, "the flood elevation would have exceeded the lowest adjacent grade of 1117 Concord Drive, thereby threatening the stability of the wall," and (4) "the clogging of the trash racks was the major contributing factor to the peak flood elevation experienced during the storm." (Emerson Rep., Def. Br., Gillispie Cert., ECF No. 70-6 at 16–17).

## I.   <u>PROCEDURAL HISTORY</u>

On April 2, 2020, Plaintiffs commenced this action, naming Haddonfield Borough and PATCO as Defendants. (ECF No. 1). On June 9, 2020, Plaintiffs filed an Amended Complaint.[2] (ECF No. 16). Following a Motion to Dismiss the Amended Complaint by PATCO, (ECF No. 17), which was denied, (ECF No. 32), the parties filed a stipulation of dismissal as to PATCO on November 8, 2021. (ECF No. 54).

---

[2] At the time the motions were filed, Defendant had not filed an Answer to the Amended Complaint, which added two additional claims for negligence and trespass. Plaintiffs had not sought default. Despite this procedural defect, Plaintiffs seek summary judgment on their trespass claim, a claim raised for the first time in the Amended Complaint. Plaintiffs were on notice of Defendant's affirmative defense of immunity under the Tort Claims Act since Defendant did assert it as a defense in its answer to the initial Complaint, (ECF No. 6 at 6). Nevertheless, the Court entered an Order directing Defendant to answer the Amended Complaint, (ECF No. 80), which Defendant filed on July 7, 2023. (ECF No. 81).

On November 16, 2022, Defendant filed the present motion.[3] (ECF No. 70). On February 7, 2023, Plaintiffs filed opposition and cross-moved for summary judgment. (ECF Nos. 72, 74). Plaintiffs filed a separate motion to preclude Defendant's expert. (ECF No. 73). Defendant opposed Plaintiffs' motions and filed a reply in support of its motion on February 21, 2023. (ECF Nos. 77–78). Plaintiffs filed a reply in support of their motions on February 28, 2023. (ECF No. 79).

II.   **LEGAL STANDARD**

A.  **Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [her] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477

---

[3]  While Defendant purportedly moves for summary judgment on all counts of Plaintiffs' Complaint, Defendant, inexplicably, did not address Plaintiffs' claims of a violation of the Takings Clause (Count One) and trespass (Count Two) in its moving brief. Rather, Defendant states that Plaintiffs raise just three claims (inverse condemnation, negligence, and nuisance), which is inaccurate. (Def. Br., ECF No. 70-2 at 2). Defendant only addresses Plaintiffs' Takings and trespass claims in its reply brief in response to Plaintiffs' Cross-Motion for Summary Judgment, (ECF No. 72-1). Thus, the Court will not consider Defendant's Motion to include seeking summary judgment as to the Takings and trespass claims. *See Aiellos v. Zisa*, No. 09-3076, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009) ("It is hornbook law that arguments raised for the first time in a reply brief are waived. . . .").

U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once met, the burden shifts to the nonmoving party to "go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(a)). To withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249–50). Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A.  Motion to Preclude Plaintiffs' Expert's Testimony

Defendant has moved to preclude Dutill, arguing that his testimony consists of personal opinions not supported by reliable hydrologic studies. (Def's. Br., ECF No. 70-2 at 5). The Court disagrees.

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579

(1993), and its progeny. *Daubert* and Rule 702 require courts to determine the admissibility of expert testimony in light of three factors: (1) the qualifications of the expert; (2) the reliability of the expert's methodology and the application of that methodology; and (3) whether the testimony fits the matters at issue in the case. *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli I*), 35 F.3d 717, 741–43 (3d Cir. 1994). The Third Circuit has noted that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence," and there is a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli II*), 916 F.2d 829, 856 (3d Cir. 1990) (internal quotations and citations omitted). Yet, the Court has an "obligation to insure that only reliable and relevant expert testimony be presented to jurors." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 111–12 (3d Cir. 2020).

As Defendant only challenges the second requirement of Rule 702, the Court so limits its analysis. Defendant maintains that Dutill's opinion was not based on "actual analysis, calculations, data or other reliable knowledge." (Def. Br., ECF No. 70-2 at 7). Plaintiffs argue that Dutill's opinion satisfies Rule 702. (Pl. Br., ECF No. 72-1 at 20).

"When an expert testifies to 'scientific knowledge,' the expert's opinions 'must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief.'" *Walker v. United States*, No. 04-1524, 2006 WL 8458685, at \*4 (E.D. Pa. Apr. 17, 2006) (quoting *In re Paoli I,* 35 F.3d at 743). In determining whether an expert's opinions are reliable, courts consider the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the

existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli I*, 35 F.3d at 742 n.8. Courts have "considerable discretion" in making these reliability determinations. *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002). Additionally, the Supreme Court observed in *Daubert* that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

Here, Dutill set forth in detail the bases for his opinion, which included analyzing the precipitation for the relevant events, the capacities of the stormwater pipes, the 2014 Modifications, the trash racks before and after the 2014 Modifications, and the 2017 road project, among other sources of information. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. K at 24:18–25:19). Additionally, as Plaintiffs note, Dutill reviewed thirty-seven documents related to the stormwater system, including data from the National Oceanic and Atmospheric Administration ("NOAA"), local climatological data, and scholarly texts, and he conducted his own site inspections. (Dutill Rep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. B at 2–3).

As for computer modeling, though he did not conduct his own computer model, Dutill conducted a "very detailed analysis" of the computer models already prepared by Defendant's expert and the Remington & Vernick computer model prepared for the 2014 Modifications. (Dutill Dep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. K at 23:21–24:4). That Dutill did not conduct his own computer analysis does not call into question the reliability of the work he did undertake and the work he relied on to reach his opinions. Indeed, the "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good

grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion. . . ." *In re Paoli I*, 35 F.3d at 744. Dutill, a civil engineer with forty-four years of experience, including that as an expert in prior litigation, has based his opinion on sufficiently good grounds. *See Walker*, 2006 WL 8458685, at *6 (concluding expert opinion reliable despite not having conducted testing because expert relied on his professional experience, his examination of the relevant sites and documents, and other studies conducted by other experts); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 149 (D.N.J. 2020) (explaining "mere fact a party disagrees with an expert's methodology is not a basis for exclusion under *Daubert*."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 76–77 (D.D.C. 2017) (rejecting arguments that expert failed to perform certain analysis, stating "[t]he Court does not consider these challenges to be *Daubert* arguments because they do not call into question the reliability of the work [the expert] actually performed."). The Court is confident that Defendant's counsel can ably cross-examine Dutill as to these issues and a jury can determine what weight, if any, should be afforded as to his opinions.

Additionally, that Defendant's expert disagrees with Dutill's opinion does not change the Court's conclusion. Specifically, Dutill's opinion that the pre-2014 stormwater drainage system had a substantially greater capacity than the new system, was based on his review of the 2017 road project engineering plans prepared by Defendant's engineering firm, Remington & Vernick, among other reports prepared by the firm. To reach this opinion, Dutill also relied on the "Concord Drive Storm Event Review" prepared by Haddonfield, he reviewed and compared photographs of the debris accumulation before and after 2014, and undertook calculations of the area before and after 2014. Additionally, he relied on his over forty-four years of experience to reach his conclusion. (Dutill Rep., Def. Br., Gillispie Cert., ECF No. 70-7, Ex. B at 4–5, Ex. K at 63:17–

69:4, 106:2–21). "As *Daubert* indicates, '[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'" *In re Paoli I*, 35 F.3d at 744 (quoting *Daubert,* 509 U.S. at 595). In fact, "the evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* And, as Plaintiffs noted, as "the Supreme Court has advised, there are no certainties in science . . . and establishing reliability does not require [p]laintiffs to prove that the assessments of their expert are correct." *In re Johnson & Johnson Talcum Powder*, 509 F. Supp. 3d at 149 (quoting *Daubert*, 509 U.S. at 590). Here, Dutill explained his methodology and identified the supporting materials relied on in reaching his conclusions and his opinion is sufficiently reliable. The fact that Defendant and its expert disagree with Dutill's interpretation of the very same data and information upon which they previously relied, and continue to rely upon in this litigation, is not a basis to exclude his opinions. As such, Defendant's Motion to Preclude is denied.[4]

### B.  Motion to Preclude Defendant's Expert's Testimony

Plaintiffs move to preclude any reference or testimony by Defendant's expert "stemming from the unverified, unavailable data previously sourced from the internet." (Pl. Br., ECF No. 73-1 at 1). Specifically, Plaintiffs contend that Emerson relied on rainfall data not obtained from the National Weather Service, as claimed, but from "unverified rainfall data someone of unknown origin posted on the internet on a website known as, Weather Underground ("WU")." (Pl. Br., ECF No. 73-1 at 4). Plaintiffs argue that while WU contains data from the National Weather Service, it also contains data from private, unidentified individuals "who can post their own data from home collection efforts or personal weather stations." (Pl. Br., ECF No. 73-1 at 4). Plaintiffs assert that

---

[4]    All other issues raised by Defendant in its Motion and not addressed herein clearly go to the weight, and not admissibility of Dutill's opinions and do not warrant discussion.

Emerson exclusively relies on unverified data from WU to state that on June 20, 2019, 3.13 inches of rain fell between 1:45 a.m. and 2:40 a.m., which made it a 200-year storm. (Pl. Br., ECF No. 73-1 at 4). To reach this conclusion, Emerson relied on a source identified as "KNJCHERR8," who is no longer on WU, and therefore, Plaintiffs are unable to question the data or test its reliability. (Pl. Br., ECF No. 73-1 at 5). Plaintiffs also take issue with Emerson's reliance on rainfall data posted by the Community Collaborative Rain, Hail and Snow Network ("CoCoRaHS"), which is a "grassroots effort of citizens measuring participating right in their own backyards," because the amount of rainfall on the website does not support Emerson's opinion that the storm was a 200-year storm, and take issue with Emerson's reliance on the Medford United States Geological Survey ("USGS"). (Pl. Br., ECF No. 73-1 at 9–10).

Defendant maintains that in response to a subpoena served on Princeton Hydro, Plaintiffs were provided with the raw data from the WU. (Def. Br., ECF No. 77 at 1). Defendant also contends that in reaching the rainfall intensity conclusions, Emerson relied on several different sources, including the National Weather Service. (Def. Br., ECF No. 77 at 2).

As Plaintiffs only challenge reliability and fit, the Court so limits its analysis. As an initial matter, the data relied on by Emerson appears to have been provided to Plaintiffs as an exhibit to Princeton Hydro's expert report.[5] (Emerson Rep., Def. Br., Gillspie Cert., ECF No. 70-6, Ex. A). Thus, Plaintiffs have access to the data despite it no longer being available on the internet.

Turning to reliability, as the Third Circuit has explained, "the reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion,

---

[5]   The data sheet attached to Defendant's opposition to Plaintiffs' Motion contains different rainfall accumulation numbers than those in the data sheet attached to Emerson's report. *See* (Emerson Rep., Def. Br., Gillspie Cert., ECF No. 70-6, Ex. A; Def. Br., ECF No. 77, Ex. A). It is unclear why the accumulation numbers vary between the documents. Nevertheless, any questions related to the discrepancy would go to the weight of the evidence, not admissibility.

[and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir.1999)). In *ZF Meritor*, relied on by Plaintiffs, the Third Circuit concluded that the expert's testimony was properly excluded because "one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown, did not provide good grounds" for the expert's opinion. *Id.* at 293 (internal quotation marks and citations omitted). Unlike the *projections* in *ZF Meritor*, here, Emerson relied on *actual data* obtained from multiple sources, including the weather station at WU, data which Plaintiffs have in their possession. (Princeton Hydro Rep., Pl. Br., ECF. 73-4, Ex. 3 at 7). He then cross-referenced that data with government sources such as the National Weather Service and ultimately deemed the data obtained from WU as the most representative of the amount of rainfall in his professional judgment given the gauge's proximity to Plaintiffs' homes. (Princeton Hydro Rep., Pl. Br., ECF. 73-4, Ex. 3 at 7). Emerson testified that all the sources he reviewed "told a similar story" such that ultimately, he chose to use the data source "that was most local to the area in question." (Emerson Dep., Pl. Br., ECF No. 73-5, Ex. 4 at 113-15–25).

Indeed, regarding rainfall data in general, Emerson testified as to the difficulty in determining when there is no weather station in the precise location. He said "when you're dealing with data like this and when you don't have, you know, the weather station right at your project site, this is the nature of this business, of this practice, is you deal with the best available data. And . . . there is some judgment that comes into that, some engineering judgment, and I think we've illustrated that here and practice it." (Emerson Dep., Pl. Br., ECF No. 73-5, Ex. 4 at 107:12–19). As Emerson states, this is the type of data relied on in his field, to which he applied his professional judgment. Indeed, "[t]he test of admissibility is not whether a particular scientific opinion has the

best foundation or whether it is demonstrably correct. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000) (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As is the case here. All the questions raised by Plaintiffs regarding the sources underlying Emerson's data and the proximity of the gauge can be probed on cross-examination and certainly go to the weight of the Emerson's opinions but are not grounds for exclusion. *See also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Finally, as to fit, Plaintiffs' contention is with what they perceived to be a misrepresentation by Emerson as to the CoCoRaHS data. Plaintiffs maintain that Emerson opined that rainfall in the amount of 4.41 inches fell around Plaintiffs' homes over an eight-hour period. But as Defendant notes in opposition, (Def. Br., ECF No. 77 at 5), Emerson did not state in the Princeton Hydro report, nor did he testify, that the CoCoRaHS' "rain gauge recorded anything other than rainfall over a twenty-four hour period." And Emerson testified that he got the duration period directly from the data sources themselves. (Emerson Dep., Pl. Br., ECF No. 73-5, Ex. 4 at 117:12–15). As such, Emerson's conclusions do "fit" the data as recorded by these various sources. For these reasons, Plaintiffs' Motion to Preclude is denied.

### C.  Summary Judgment

Defendant has moved for summary judgment, arguing that the design immunity under the Tort Claims Act ("TCA"), N.J.S.A. § 59:4-6, applies and alternatively, Plaintiffs' claims fail as a matter of law. (Def. Br., ECF No. 70-2 at 2, 14, 16). Plaintiffs cross-moved for summary judgment on their trespass claim, arguing Defendant's "negligence in implementing the 2014

[Modifications], improperly installing the trash racks, directing additional surface water at the homes without any analysis required by New Jersey law, and failing to maintain its property, resulted in a trespass of water from the Borough's land onto Plaintiffs' property." (Pl. Br., ECF No. 72-1 at 39). After reviewing the record, the Court concludes that there are genuine disputed issues of fact as to whether Defendant has met its burden to prove it is entitled to immunity under the TCA. The Court also concludes that neither Defendant nor Plaintiffs are entitled to summary judgment on any Count of the Amended Complaint given the many significant material facts in dispute.

1.  <u>Defendant has failed to carry its burden to show it is entitled to immunity under the TCA as a matter of law.</u>

Under the TCA, liability is permitted against a public entity for an injury caused by a dangerous condition of the public entity's property. N.J.S.A. § 59:4-1(a). Defendant maintains it is immune from suit under the TCA's plan-or-design immunity, N.J.S.A. § 59:4–6(a), which states:

> Neither the public entity nor a public employee is liable . . . for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

*See also Manna v. State*, 609 A.2d 757, 762 (N.J. 1992). Indeed, the comment to the statute specifically states that the statute is intended "to grant a public entity and a public employee complete immunity for injuries resulting from a plan or design of public property when it has been officially approved by an authorized body." N.J.S.A. § 59:4–6(a). This immunity seeks to protect highly discretionary governmental activity, such as the approval of plans and designs, from liability. N.J.S.A. § 59:4–6(a). The burden is on the public entity to both plead and *prove* its immunity under the TCA. *See Kolitch v. Lindedahl*, 497 A.2d 183, 189 (N.J. 1985).

To establish plan-or-design immunity, a public entity must show "an approved feature of the plan sufficiently addressed the condition that is causally related to the accident." *Manna,* 609 A.2d at 763. Specifically, a public entity must show that "the design feature in question was contained in the construction plans, those plans were approved by the public entity, and the construction was undertaken in accordance with the plans." *Leibig v. Somerville Senior Citizens Hous., Inc.*, 740 A.2d 686, 689 (N.J. App. Div. 1999).

Here, Defendant argues that it is immune from suit under the TCA because the 2014 Modifications were a plan or design of public property officially approved by an authorized body. (Def. Br., ECF No. 70-2 at 3). Plaintiffs contend that Defendant has failed to prove it is entitled to immunity because there is no competent evidence that the designs existed, were approved, and construction was completed in accordance with the designs. (Pl. Br., ECF No. 72-1 at 9–10). Specifically, Plaintiffs contend that (1) the meeting minutes from Haddonfield's Board of Commissioners dated May 13, June 10, and August 19, 2014, are all unsigned; (2) Haddonfield's engineer testified that the project designs for the 2014 Modifications were not in the bundle of documents that Defendant now claims are the project designs; (3) the purported designs are dated July 9, 2014, *after* two of the Board of Commissioners meetings; (4) a Haddonfield administrator testified that the Haddonfield engineers never met with the Commissioners about the designs or how it would improve the Concord Drive drainage problem; (5) nothing in the August 19, 2014 meeting reflects approval of any designs and, as a logical matter, could not have since the work had already been completed *before* the meeting; and (6) Defendant's expert testified that the trash racks added as part of the 2014 Modifications were installed incorrectly, among other concerns. (Pl. Br., ECF No. 72-1 at 6–9). Thus, while there is no dispute that the plan-or-design immunity under the TCA is squarely applicable, Plaintiffs have pointed to specific facts evidencing genuine

17

and disputed issues of fact as to whether Defendant is entitled to such immunity, including whether the 2014 Modifications sufficiently addressed the drainage problems on Concord Drive, whether those plans were officially approved by the governing body, and whether those plans were implemented without deviations.

While Defendant relies upon many documents in support of its argument that such a plan was officially authorized, including documents from Remington & Vernick, Haddonfield's engineering firm, discussing a pre-construction meeting for the 2014 Modifications project, (Def. Br., ECF No. 70-8, Ex. D at 23), letters referencing executed contracts for the 2014 Modifications project, (Def. Br., ECF No. 70-8, Ex. D at 24–26), bid approvals for the 2014 Modifications project, (Def. Br., ECF No. 70-9, Ex. D at 4), and the August 19, 2014 Board of Commissioners' resolution releasing a performance bond for the 2014 Modifications, (Def. Br., ECF No. 70-9, Ex. D at 7), Plaintiffs point to specific facts showing a genuine dispute as to whether a plan, addressing the drainage issue, was officially authorized by Haddonfield. Specifically, Plaintiffs point to the testimony of Stephanie Cuthbert, a Remington & Vernick engineer, who testified that the documents provided by Defendant were not the designs for the 2014 Modification, (Cuthbert Dep., Def. Br., Gillispie Cert., ECF No. 70-14, Ex. I at 53:1–56:20), Sharon McCullough, an administrator for Haddonfield, who testified that there was never a presentation to the Board of Commissioners regarding the designs and how it would improve the drainage problems on Concord Drive, (McCullough Dep., Pl. Br., ECF No. 72-6, Ex. O at 43:17–24), and Cuthbert's testimony that she was unaware if any analysis was done related to the impact on the drainage system's capacity or efficiency, (Cuthbert Dep., Def. Br., Gillispie Cert., ECF No. 70-14, Ex. I at 60:4–13).

Additionally, Plaintiffs point to Defendant's expert's testimony that the trash racks installed as part of the 2014 Modifications were not installed properly. Specifically, Defendant's expert, Clay Emmerson, Ph.D., opined in his report:

> The trash racks installed on the outlet structure for the 36- inch diameter and 24-inch diameter culverts do not appear to have been installed per the manufacturer's details. The details from the manufacturer clearly show support below the entire trash rack on all four sides. For the two rear trash racks, the outlet structure did not have a bearing surface to support the trash racks on the side nearest to the headwall/embankment. This likely contributed to the collapse of the trash rack.

(Emmerson Rep., Def. Br., Gillispie Cert., ECF No. 70-6, Ex. A at 17).

While not the strongest evidence, this evidence casts doubt on whether Defendant can prove it is entitled to immunity under the TCA, and it is not the role of the Court to make credibility determinations or engage in any weighing of the evidence. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Instead, the Court must determine whether there is a genuine issue for trial and here the Court finds genuine issues of fact as to whether plans, that specifically addressed the drainage issues, were officially authorized, and implemented according to the approved plan. *See Kolitch*, 497 A.2d at 189 ("It is well established that the burden is on the public entity both to plead and prove its immunity under [the TCA], and that to succeed on a motion for summary judgment, the entity must come forward with proof of a nature and character [that] would exclude any genuine dispute of fact.") (internal citations and quotation marks omitted); *Daniel v. New Jersey Dep't of Transp.*, 571 A.2d 1329, 1346–47 (N.J. App. Div. 1990) (concluding "jury question was presented with respect to whether the State was clothed with plan or design immunity," specifically as to whether the design or plan embraced the specific feature plaintiff contends created the dangerous condition and whether that plan was actually approved); *Ellison v. Hous. Auth. of City of S. Amboy*, 392 A.2d 1229, 1232 (N.J. App. Div. 1978) (reversing summary judgment and remanding for trial after concluding that fact issue existed as to the approval of the

19

design and plan such that summary judgment was precluded and public entity could proceed at trial to prove the facts supporting its claim to plan-or-design immunity).

For example, in *Daniel*, none of the documents relied upon by the public entity specifically referred to a deliberate decision to create the specific feature that the plaintiffs contended created the dangerous condition. 571 A.2d at 1346–47. In fact, there, the court concluded that the documents submitted suggested that the project was routine maintenance. *Id.* at 1347. Additionally, the court explained that there was an issue as to whether the work was approved because the offset sheets—consisting of numerical measurements—were post-dated, the work order was just stamped with a facsimile of the supervising engineer of the public entity, and the documents suggested that the supervising engineer did not even see the plans before he approved them. *Id.*; *see also Thompson v. Newark Hous. Auth.*, 531 A.2d 734, 740 (N.J. 1987) ("The specific design or plan detail alleged to constitute the dangerous condition must have been given official approval for the immunity to attach.") (citations omitted). Unlike *Daniel*, there is some evidence suggesting that the plans for the 2014 Modifications were prepared and undertaken to resolve the drainage problems on Concord Avenue. Nevertheless, Plaintiffs have pointed to specific facts in the record suggesting that, like *Daniel*, there is an issue as to whether the plans were officially approved and authorized by Haddonfield and whether the ultimate construction was completed in accordance with the plans. *See May v. Atl. City Hilton*, 128 F. Supp. 2d 195, 202–03 (D.N.J. 2000) (denying summary judgment after concluding factual issues existed with respect to town's plan-or-design immunity defense because the plan lacked specifications as to the alleged dangerous condition, the plans were not signed and bore no other indicia of approval, and while the town's engineers recalled that the plans were approved, they could not provide evidence beyond the plans

themselves). For these reasons, there are genuine disputed issues of fact as to whether Defendant is immune under the TCA.

2.  <u>Defendant is not entitled to summary judgment on Plaintiffs' claim for inverse condemnation.</u>

Defendant argues Plaintiffs' claim of inverse condemnation is without merit and should be dismissed because the Borough did not "take" Plaintiffs' properties nor perform an overt act on their property that resulted in a physical occupation of the properties. (Def. Br., ECF No. 70-2 at 15). In turn, Plaintiffs argue that they are entitled to a trial on their inverse condemnation claim because a temporary flooding can constitute a taking and Defendant performed an overt act that resulted in a physical occupation of their land when it modified the drainage system. (Pl. Br., ECF No. 72-1 at 33).

As an initial matter, though Plaintiffs' Amended Complaint specifically raises two separate Counts—Count One for a violation of the Takings Clause under 42 U.S.C. §§ 1983, 1988, and Count Two for inverse condemnation also under 42 U.S.C. §§ 1983, 1988, (Am. Compl., ECF No. 16, ¶¶ 60–63)—Defendant inexplicably only addresses inverse condemnation in its brief and primarily cites state law cases though both claims are brought under federal law and provide the only basis for this Court's jurisdiction. Similarly, Plaintiffs only mention the inverse condemnation claim in opposition. In reply, Defendant, for the first time, mentions the separate Takings claim but in an entirely conclusory fashion. Even though these claims are intertwined and often discussed in tandem, Plaintiffs have brought two separate causes of action and only one is addressed. Moreover, to the extent that the inverse condemnation claim is addressed, neither party adequately briefed all issues required for a proper analysis. The Court is, thus, left without adequate briefing to evaluate the inverse condemnation claim: the only federal claim on which Defendant moved for summary judgment and essentially no briefing on the claim under the Takings clause.

Section 1983 provides that, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "A taking may be either 'direct government appropriation or physical invasion of private property,' or government regulation that is so onerous that it effectively accomplishes a 'direct appropriation or ouster.'" *Deptford Commons, LLC v. Twp. of Deptford*, No. 22-4931, 2023 WL 5551025, at *5 (D.N.J. Aug. 29, 2023) (quoting *Nekrilov v. City of Jersey City*, 528 F. Supp. 3d 252, 266 (D.N.J. 2021)); *see also Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). "When a state directly appropriates private property, it is considered a *per se* taking, and the state has a duty to compensate the owner." *Am. Exp. Travel Related Servs., Inc.*, 669 F.3d at 370.

"To prove that a violation of the Takings Clause has occurred, courts typically engage in a two-step inquiry whereby they must (1) identify that the plaintiff has asserted a 'legally cognizable property interest' and (2) ask (a) 'was there a taking?'; (b) 'was the taking for public use?'; and (c) 'did the claimant receive just compensation?'" *Deptford Commons, LLC*, 2023 WL 5551025, at *5 (quoting *Nekrilov*, 528 F. Supp. 3d at 266). Additionally, "[a] landowner may assert a claim

under the Takings Clause in federal court pursuant to 42 U.S.C. § 1983 as soon as a government

actor takes the landowner's property without paying for it." *Id.* (citing *Knick v. Twp. of Scott*, 139

S. Ct. 2162, 2170 (2019)). Indeed, the Supreme Court recently held that "[t]he landowner need not

litigate his takings claim in state court or first pursue post-takings remedies that may be available

by the state." *Id.* (citing *Knick*, 139 S. Ct. at 2170).

Meanwhile, "[a] claim for 'inverse condemnation' is the manner in which a landowner

recovers just compensation for a *de facto* taking of his property without condemnation

proceedings." *Singh v. Droppa*, No. 20-1317, 2022 WL 3716501, at *2 (D.N.J. Aug. 29, 2022).

While "the typical taking occurs when the government acts to condemn property in the exercise of

its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the

proposition that a taking may occur without such formal proceedings." *In re 106 N. Walnut, LLC*,

447 F. App'x 305, 309 (3d Cir. 2011) (quoting *First Eng. Evangelical Lutheran Church v. Cnty.*

*of Los Angeles*, 482 U.S. 304, 316 (1987)). "A property owner is only entitled to recover . . . if the

government action deprived him of all or substantially all of the beneficial use of the property."

*Singh*, 2022 WL 3716501, at *2 (citation and internal quotation marks omitted). Thus, "[n]ot every

impairment in property value caused by government action constitutes a taking." *Fisher v. Pratt*,

No. 19-273, 2020 WL 773262, at *6 (D.N.J. Feb. 18, 2020). In fact, "diminution in property value,

standing alone, can[not] establish a [ ]taking[.]" *Id.* (alterations in original).

Here, Plaintiffs maintain that the flooding on their properties resulted in a taking without

just compensation. (Pl. Br., ECF No. 72-1 at 31–35). Previously, courts had distinguished flooding

in which a public entity permanently takes over land, such as impounding water behind a dam, and

flooding that merely damages property, such as releasing water from a dam. *See Williams v. United*

*States Army Corps of Eng'rs*, No. 06-834, 2007 WL 2261559, at *8 (D.N.J. Aug. 2, 2007), *aff'd*

321 F. App'x 129 (2009). Historically, flooding resulting in a permanent takeover of property was considered a "taking" but flooding resulting in mere property damage was a "tort." *Id.* However, the Supreme Court has since held that flooding that results in temporary "takings" can too be compensable. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 34 (2012). There, the Court explained, "[b]ecause government-induced flooding can constitute a taking of property, and because a taking need not be permanent to be compensable, our precedent indicates that government-induced flooding of limited duration may be compensable." *Id.* The Court continued, "[n]o decision of this Court authorizes a blanket temporary-flooding exception to our Takings Clause jurisprudence, and we decline to create such an exception in this case." *Id.* As such, a temporary flooding may constitute a taking.

> In so holding,
>
> the Supreme Court identified several factors for courts to consider in assessing whether there has been a taking, among them: (i) the duration of the flooding; (ii) whether the invasion is intended or is the foreseeable result of authorized government action; (iii) the character of the land at issue and the owner's 'reasonable investment-backed expectations' regarding the land's use; and (iv) the severity of the interference.

*Penna v. United States*, 153 Fed. Cl. 6, 21 (Fed. Cl. 2021), *appeal dismissed*, No. 2021-2079, 2022 WL 2208885 (Fed. Cir. Feb. 1, 2022) (quoting *Arkansas Game & Fish*, 586 U.S. at 38–39). To be sure, as with all physical occupations, "Plaintiffs must plausibly allege that the government directly and proximately caused the flooding." *Billie v. Vill. of Channahon*, No. 20-3294, 2022 WL 846754, at *3 (N.D. Ill. Mar. 22, 2022), *aff'd sub nom. Billie v. Vill. of Channahon, Illinois*, 58 F.4th 905 (7th Cir. 2023) (citing *Ministerio Roca Solida, Inc. v. United States*, 156 Fed. Cl. 346, 365 (Fed. Cl. 2021)). "In other words, takings claims must be based 'on affirmative government acts,' and the government cannot be liable for a mere 'failure to act.'" *Id.* (citing *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360–61 (Fed. Cir. 2018)).

Indeed, "[t]he reason for the application of an ad hoc, multifactor test in flooding cases is that . . . [n]ot every physical *invasion* is a taking." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). "[I]ntermittent flooding [and other] cases reveal [that] such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." *Penna*, 153 Fed. Cl. at 21 (citing *Loretto*, 458 U.S. at 435 n.12) (alterations in original). Yet, "[f]looding cases, like other takings cases, should be assessed with reference to the particular circumstances of each case. . . ." *Bennett v. City of Centreville*, No. 20-530, 2020 WL 6079233, at *2 (S.D. Ill. Oct. 15, 2020) (quoting *Arkansas Game & Fish*, 568 U.S. at 37).

Despite the intense factual inquiry and balancing required for an inverse condemnation claim, including whether there was a *de facto taking* resulting from the flooding, Defendant merely states in conclusory fashion that the Borough did not "take" Plaintiffs' properties as the Borough merely holds an easement for stormwater management purpose. (Def. Br., ECF No. 70-2 at 15). Defendant argues that Plaintiffs' properties were only affected by the storm, which resulted in a flooding, "not any action on the part of Haddonfield." (Def. Br., ECF No. 70-2 at 15). In reply, Defendant summarily maintains that Plaintiffs have failed to show that they have been deprived of all reasonable use of their properties. (Def. Reply, ECF No. 78 at 15).

In so arguing, Defendant fails to cite *Arkansas Game & Fish Commission*, which indisputably held that a temporary flooding can constitute a taking, or any of the federal caselaw thereafter interpreting and applying the test set forth therein. 568 U.S. at 34. Indeed, the only federal case cited by Defendant in arguing that Plaintiffs have failed to show that they have been deprived of all reasonable use of their properties, *Williams*, 2007 WL 2261559, pre-dates *Arkansas*

*Game & Fish Commission*. In failing to address *Arkansas Game & Fish Commission*, Defendant provides no analysis of the multi-factor test outlined therein. Specifically, Defendant has not addressed the duration of the flooding, the character of the land at issue, and the severity of the interference in any detail. In fact, the only factor discussed is causation, and though its analysis is cursory at best, it is also vigorously disputed by Plaintiffs.

Defendant further ignores the fact that Plaintiffs argue it was the flooding resulting from *stormwater drainage system on the easement* that resulted in the alleged physical occupation of Plaintiffs' property, albeit a temporary one, not the easement itself. (Pl. Br., ECF No.72-1 at 32, 34). And it overlooks Plaintiffs' allegations as to severe damage caused to their properties. Indeed, as noted, the Luciotti's home was ultimately deemed uninhabitable by the Borough. (Pl. SOMF, Pl. Br., ECF No. 72-2, ¶ 40). And the Vespe family spent half of 2019 in a pop-up camper on their front lawn, while their home was repaired. (Pl. SOMF, Pl. Br, ECF No. 72-2, ¶ 41).

Yet, similarly lacking is Plaintiffs' briefing which solely addressed the overt actions which they purport resulted in a taking of their property. Plaintiffs merely point to evidence that the 2014 Modifications resulted in higher water surface elevation, which in turn resulted in more water on Plaintiffs' property. Plaintiffs also rely on Defendant's expert's testimony that the trash racks were improperly installed, and that the 2017 modifications known as the road project, which added additional inlets to the drainage system, directed more surface water to Plaintiffs' homes. Additionally, Plaintiffs rely on their expert's disagreement with Defendant's characterization of the storm as a severe weather event. (Pl. Br., ECF No 72-1 at 31–35). Yet, Plaintiffs do not cite any case which has addressed whether modifications to and maintenance of a stormwater drainage system, and ensuing flooding—presuming causation can be established—can constitute a *de facto*

taking, nor do Plaintiffs address any of the additional factors outlined in *Arkansas Fish & Game Commission* and the subsequent caselaw.

Additionally, for the inverse condemnation analysis, Plaintiffs do not address whether the Borough's actions deprived them of "all or substantially all of the beneficial use of the property." Citation. Though Plaintiffs undoubtedly suffered significant damage to their properties, Plaintiffs do not discuss this element of their inverse condemnation claim. *See Khan v. City of Bayonne*, No. 18-05825, 2021 WL 2709539, at *7 (D.N.J. June 30, 2021) (concluding, in the context of an alleged taking from a demolition, the "demolition of a dangerous property cannot alone amount to a taking when a plaintiff retained ownership of the property after the demolition and can still put the property to any number of beneficial uses.") (internal quotation marks and citation omitted). However, based upon the record, there is at the very least a factual question as to whether they have been deprived of all reasonable use of their properties.

In addition to the failure to address these crucial factual and legal issues, as previously noted, the parties agree on very little. Notably, the parties disagree as to: (1) the cause of the severe property damage, including whether the modifications to the stormwater system contributed, or even directly caused, the property damage; (2) the intensity of the rainfall; (3) the effectiveness, or ineffectiveness, of the modifications to the drainage system, including whether the modifications actually increased the amount of water accumulation on the property; and (4) the maintenance, or lack thereof, of the drainage system. All acts which speak to whether this was in fact government induced flooding and whether there was a *de facto* taking that deprived Plaintiffs of all or substantially all beneficial use of their property.

Thus, the Court cannot grant summary judgment on the inverse condemnation claim as neither party addressed the multi-factor test outlined in *Arkansas Fish & Game Commission*.[6] As such, Defendant's Motion is denied as to the inverse condemnation claim.

### 3. Defendant is not entitled to summary judgment on the nuisance and negligence claims under the TCA.

As to both claims, Defendant maintains that Plaintiffs cannot support their claim that the outdated drainage system's failure to keep up with municipal growth proximately caused Plaintiffs' flooding problems to increase. (Def. Br., 70-2 at 16–19). Additionally, Defendant contends that Plaintiffs cannot show that its actions were palpably unreasonable. (Def. Br., 70-2 at 16–19). In response, Plaintiffs argue that there is sufficient evidence that the 2014 Modifications increased the amount of stormwater that flowed to Plaintiffs' property and that Defendant was on notice that the 2014 Modifications did not solve the drainage problem and yet chose not to act. (Pl. Br., ECF No. 72-1 at 15–20, 35–36).

Under the TCA,

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that . . . a public entity had actual or constructive notice of the dangerous condition.

N.J.S.A. § 59:4-2. Additionally, a public entity may be liable for creating a "nuisance where its actions can be found to be palpably unreasonable." *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 449 A.2d 472, 478 (N.J. 1982). "When analyzing a nuisance, however, wrongful

---

[6] It is incumbent on the moving party to demonstrate "the basis for its motion" and for the non-moving party to show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323. Here, neither party has met its burden. As such, the Court is left with insufficient briefings and arguments on the sole federal claims at issue in this case which are factually and legally complex. And the Court declines to do the parties' work for them.

conduct is not limited to the creation of the condition. Rather, a failure to physically remove or legally abate that condition, resulting in the physical invasion of another's property, also constitutes wrongful conduct." *Lyons v. Twp. of Wayne*, 888 A.2d 426, 431 (N.J. 2005). The plaintiff bears the burden of proving that the defendant acted in a palpably unreasonable matter. *Muhammad v. New Jersey Transit*, 821 A.2d 1148, 1154 (N.J. 2003). "Palpably unreasonable behavior is that which is patently unacceptable under any given circumstance. For a public entity to have acted or failed to act in a manner that is palpably unreasonable, it must be manifest and obvious that no prudent person would approve of its course of action or inaction." *Trotta v. Borough of Bogota*, No. 12-2654, 2016 WL 3265689, at *12 (D.N.J. June 6, 2016) (citations, alterations, and internal quotation marks omitted). "Whether or not a public entity's actions were palpably unreasonable 'is a jury question . . . except in cases where reasonable men could not differ.'" *May*, 128 F. Supp. 2d at 202 (citation omitted).

Defendant cites *Barney's Furniture Warehouse v. City of Newark*, a pre-TCA case, in support of its argument that it is not liable for floods resulting from "a gradually increasing functional incapacity of the sewer system." 303 A.2d 76, 82–83 (N.J. 1973). There, the Court found that there was no affirmative duty on the part of the municipality to keep its sewer plant "abreast of developing needs." *Id.* at 469. Yet, Plaintiffs are not suggesting nor does the evidence suggest, as in *Barney's Furniture Warehouse*, that the drainage system only became inadequate based on the age of the system coupled with urban development and increased demands on the drainage system. Rather, Plaintiffs contend that the *2014 Modifications*, among the other subsequent projects undertaken by Defendant, along with the failure to maintain and repair the drainage system, caused the flooding and property damage to Plaintiffs' home. (Pl. Br., ECF No. 72-1 at 35–36).

Specifically, Plaintiffs maintain that the stormwater drainage system on the easement was a dangerous condition as Defendant's own expert recognized flooding is a safety issue. (Emmerson Dep., Pl. Br., ECF No. 72-1, Ex. S at 65:4–6). Plaintiffs also maintain that Defendant was on notice of the dangerous condition as the area flooded in 2016, even after the 2014 Modifications. (Pl. Br., ECF No. 72-2, Ex. U).   Plaintiffs contend that Defendant's expert conceded that the 2014 Modifications resulted in more water being present than otherwise would have been prior to the 2014 Modifications. (Emmerson Dep., Pl. Br., ECF No. 72-10, Ex. S at 198:21–199:4). Plaintiffs also maintain that despite the complaints from Plaintiffs, Defendant did not maintain the area behind their homes by conducting weekly inspections of inlets as required. (Pl. Br., ECF No. 72-2, Ex. X; McCullough Dep., Pl. Br., ECF No. 72-6, Ex. O at 85:16–20).

Putting aside the question of whether Defendant can establish that it is ultimately immune under the plan-or-design immunity of the TCA, Plaintiffs have presented enough evidence raising a genuine issue as to whether the drainage system was a dangerous condition under the TCA. Indeed, and as discussed, there is certainly a genuine factual dispute as to whether Defendant's actions were palpably unreasonable regarding the impact of the 2014 Modifications, Defendant's actions following the 2014 Modifications when there were still complaints of flooding prior to the 2019 storm, the installation of additional inlets in 2017 without analyzing the potential impact on Plaintiffs' properties, and Defendant's failure to maintain the drainage system. *See Lyons*, 888 A.2d at 427 (explaining flooding caused by stormwater runoff that originated on municipal property could establish a prima facie case of nuisance); *Pandya v. State, Dep't of Transp.*, 867 A.2d 1236, 1246–47 (N.J. App. Div. 2005) (reversing entry of summary judgment after concluding plaintiff established a  prima facie case of dangerous condition given the delay in implementation

of recommended changes by the public entity, among other reasons). Given these disputed facts, Defendant is not entitled to summary judgment on Plaintiffs' nuisance and negligence claims.

    4.  <u>Plaintiffs are not entitled to summary judgment on their trespass claim.</u>

Plaintiffs argue that Defendant's "negligence in implementing the 2014 Retrofit, improperly installing the trash racks, directing additional surface water at the homes without any analysis required by New Jersey law, and failing to maintain its property, resulted in a trespass of water from the Borough's land onto Plaintiffs properties." (Pl. Br., ECF No. 72-1 at 39). Defendant maintains that there is insufficient evidence in the record to find that its conduct was intentional to support a finding of trespass. (Def. Reply, ECF No. 78 at 18–19).

New Jersey law defines trespass as "the unauthorized entry onto the property of another." *New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 478 (D.N.J. 1998). New Jersey has adopted the standard of liability for trespass claims set forth in the Restatement. *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (citing *Ross v. Lowitz*, 120 A.3d 178, 188 (N.J. 2015)). Under this standard, a party may be liable for trespass if they intentionally, negligently, recklessly, or as the result of an abnormally dangerous activity, enter or cause another person or object to enter onto the land of another. *Id.* (citing Restatement (Second) of Torts §§ 158, 165). If the entry was not intentional, the defendant will only be liable for trespass if the entrance caused damage to the land, the possessor of the land, or another thing or person "in whose security the possessor has a legally protected interest." *Id.*

As previously noted, there are genuine disputed issues of material fact regarding whether the 2014 Modifications caused more water to be present behind Plaintiffs' home, whether the trash racks were properly installed, whether subsequent projects directed more water to the drainage

system, and the system's maintenance; all preclude an entry of summary judgment to either party. For the same reasons, Plaintiffs are not entitled to summary judgment on their trespass claim.

## **CONCLUSION**

In sum, the Court cannot grant either party's motion for summary judgment. However, the Court does not intend to suggest that the Plaintiffs' road to establish liability will be an easy one. Rather, Plaintiffs face substantial factual and legal hurdles to overcome in order to establish that, despite the seeming widespread and historic impact of the 2019 storm, *but for* the Borough's actions their homes would not have sustained the property damage. Stated differently—that it was in fact government-induced flooding that caused their property damage. Further, even if they can do so, Plaintiffs then must be able to establish each of the factors required to establish a *de facto* taking. The Court expresses no opinion as to whether Plaintiffs will be able to do so at the time of trial.

For the foregoing reasons, Defendant's Motion for Summary Judgment and to Preclude Plaintiffs' expert is **DENIED,** Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**, and Plaintiffs' Motion to Preclude Defendant's Expert is **DENIED**. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**